UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JOHNNY MALDONADO,

                Petitioner,

                                            Case No. 16-cv-115-pp

        v.

RANDALL HEPP,

                Respondent.

**ORDER DISMISSING AMENDED PETITION (DKT. NO. 17), DENYING
CERTIFICATE OF APPEALABILITY AND DISMISSING CASE**

On October 19, 2020, petitioner Johnny Maldonado filed an amended

petition for a writ of *habeas corpus* under 28 U.S.C. §2254, challenging his

2012 conviction for first-degree intentional homicide and attempted first-degree

intentional homicide. Dkt. No. 17. The petitioner raised four grounds for relief:

three claims of ineffective assistance of trial counsel and one claim of

ineffective assistance of appellate counsel. The respondent opposed the

petition. Dkt. No. 39. Because the court of appeals' rejection of the petitioner's

ineffective assistance of counsel claims was not an unreasonable application of,

or contrary to, clearly established federal law, the court will deny the petition,

deny a certificate of appealability and dismiss the case.

I.      **Background**

        A.      <u>Criminal Case</u>

On October 8, 2010, the State of Wisconsin filed a criminal complaint

against the petitioner, charging him with first-degree intentional homicide and

1

attempted first degree intentional homicide. Dkt. No. 26-1. The Wisconsin Court of Appeals described the facts in the criminal complaint:

> [P]olice found the body of Spencer Buckle on April 11, 2009, in an alley near the 1100 block of West Grant Street in Milwaukee, Wisconsin. The county medical examiner determined that Buckle died of a gunshot wound to the head and deemed Buckle's death a homicide. The complaint further states that police spoke to Sergio Vargas. He described hearing gunshots as he walked in the alley with Buckle, [the petitioner] and Raymond L. Nieves. Vargas then saw Buckle fall to the ground. Vargas said that he also fell to the ground and that he "played dead" because he realized that his companions, [the petitioner] and Nieves, were the shooters. Vargas went on to report that while he was on the ground, he was shot in the hand. He said that he could see [the petitioner's] feet, and he could hear additional gunshots as bullets went past his head. Vargas said that he remained on the ground until he was certain that [the petitioner] and Nieves had left the scene.

Dkt. No. 26-6 at ¶2. The State filed an information charging the petitioner and Nieves with first-degree intentional homicide and attempted first-degree intentional homicide by use of a dangerous weapon and as a party to the crime. Id. at ¶3. Both the petitioner and Nieves requested a jury trial. Id.

As the Wisconsin Court of Appeals recounted, during pretrial proceedings, the State sought leave to present additional acts evidence, showing that the petitioner, Nieves, Buckle and Vargas were members of a street gang called the Maniac Latin Disciples, a rival of the Latin Kings gang. Id. at ¶4. According to the State, in March 2009, a member of the Latin Kings fired shots at Vargas and in retribution, Vargas—along with the petitioner, Nieves, Buckle, Vargas, and a fifth individual—killed a member of the Latin Kings in Waukegan, Illinois. Id. The State argued that after the Waukegan shooting, the petitioner and Nieves became suspicious that Buckle, Vargas and

the fifth individual were cooperating with law enforcement, motivating the petitioner and Nieves to kill Buckle and attempt to kill Vargas. Id. The trial court granted the State's motion and, over the petitioner's objection, admitted the evidence of the events surrounding the Waukegan homicide, providing a limiting instruction that the jury could consider the evidence only with respect to a possible motive to commit the crimes. Id. at ¶5.

The petitioner and Nieves proceeded to trial together. At trial, the State presented Vargas as a witness. Vargas testified about the events leading up to the Waukegan shooting. He explained that on March 22, 2009, members of the Latin Kings shot at him and two other members of his gang—Buckle and Fat Boy. Dkt. No. 26-21 at 36:6-24. Vargas explained that after the shooting he met with Nieves and the petitioner to recount the incident, to which Nieves responded that the group needed to exact revenge. Id. at 39:11-22. According to Vargas, Nieves drove the group to a basketball court where they shot at individuals whom they believed to be Latin Kings. Id. at 40:4-42:10. After the shooting, the group dropped off Fat Boy and drove to Kenosha, Wisconsin where they hid in a house. Id. at 42:14-45:12.

Vargas explained that shortly thereafter, he discovered that an individual had died in the shooting. Upon hearing that news, the petitioner and Nieves became paranoid that people were discussing the names of the individuals involved in the shooting. Id. at 49:20-50:16.

Vargas also testified about his encounter with an individual nicknamed "Boogie Man," who came to the Kenosha house while the group remained in hiding. Vargas testified:

> Q: Did you have a conversation with him?
> A: Yes.
> Q: Did he say anything to you that caused you concern?
> A: Yes.
> Q: And what did he say to you that caused your concern?

Id. at 51:21-52:1. At that point, Nieves' attorney objected to the question as eliciting hearsay. Id. at 52:2. The court overruled the objection, explaining that it would allow the jury to hear what Boogie Man had to say, not for the truth of the matter of asserted but to understand how Vargas felt upon hearing the statements. Id. at 52:3-7. Vargas's direct examination continued:

> Q: So what was said that made you concerned?
> A: He said that they were planning on killing me, that Raymond Nieves and [the petitioner] were planning on killing me.
> Q: And did you believe him?
> A: In a way I kind of didn't.
> Q: At the time?
> A: At the time I didn't.
> Q: Did you just blow that off?
> A: Yeah, kind of forgot about it. But I was still thinking, and I got a little bit more nervous.
> Q: As time [went] on?
> A: What was that?
> Q: As time went on you got a little more nervous?
> A: Yes.
> Q: And when you were told this by Boogie Man, do you know if Mr. Buckle was there at this time?
> A: Yes, he was there.
> Q: What was Mr. Buckle's reaction to that?
> A: He seemed a little nervous too. He told me that he didn't believe it, but he still had a feeling, just like I did.

Dkt. No. 26-21 at 52:10-53:6.

4

Vargas testified that at some point, Nieves told him that the group had to go to a new hideout in Milwaukee; Michael Schottee drove the group to Milwaukee. Id. at 53:13-54:25. He testified that at that time, the petitioner was wearing black tennis shoes. Id. at 57:1. As the group reached Milwaukee, Schotte parked the car in a residential neighborhood; it had become nighttime, and the four individuals—Nieves, the petitioner, Vargas, and Buckle—exited the car walking down the sidewalk. Id. at 57:20-59:15. The group turned into an alley. Id. at 59:17-23. Vargas explained what happened next:

Q: What happens next. You stop there, [Nieves and the petitioner] are on the other side of the alley, what happens?

A: I seen [the petitioner] goes up to, like it looked like a garage to me. It was, like, a garage. I don't know if he's pretending to use a washroom or doing something. But, I don't know, Raymond Nieves was like, there's somebody running behind you all. As we turning, I just see Spencer—I hear a gunshot, I see a flash, and I see Spencer Buckle fall to the ground.

Q: And who are the only four people in the alley at that point in time?

A: Raymond Nieves, [the petitioner], Spencer Buckle and me.

Q: Did you see any person running down the alley when Nieves said this?

A: No.

Q: How close to Mr. Buckle were you at that point in time when you say you heard gunshots?

A: At arm's reach.

Q: And where was Mr. Nieves?

A: Right next to Buckle.

Q: And did you know where [the petitioner] was at that point in time?

A: He ended up right behind me. It happened so fast.

Q: And as these shots were being—going, fired, and you saw Mr. Buckle falling, what did you do?

A: As I was turning to see, facing toward Nieves, I heard more shots and seen flashes coming my way. So I threw myself on the ground as I was shot, like when I really was not shot, I threw myself on the ground and played dead. That's when I seen [the petitioner's] black tennis shoes come up.

5

> As I was laying on the floor, I was laying down a certain way where my hand, this hand was spread out and this hand, my hood was cupped over it and I could see under it, and that's how I could see [the petitioner's] black tennis shoes.

Id. at 61:23-63:9.

Vargas testified that as he lay on the street pretending to be dead, he saw the petitioner's shoes come to the front of his view and felt something resembling a gun pressed to the back of his head. Id. at 63:10-64:1. Vargas "heard shots being fired towards [his] head" and "could feel the wind of the bullets passing through [his] head and . . . felt the burn where [he] got grazed at from [his] left hand." Id. at 64:2-12. Vargas testified that after the shooting stopped, he didn't get up right away; when he did get up, he saw that Buckle had been shot and went to nearby houses to try and find a cellphone to call for help. Id. at 66:5-68:5. Vargas eventually spotted a police car, which he waved down, and explained to the officers what had just occurred. Id. at 68:16-69:7. The detectives went back to the alley, where they discovered Buckle had passed away. Id. at 69:8-10.

Among its other witnesses, the State called Ramon Trinidad, who in October and November 2010 was incarcerated at the Milwaukee County Criminal Justice Facility in the same pod as the petitioner. Dkt. No. 26-23 at 12:15-25. Trinidad testified that while the two were incarcerated together, the petitioner had discussed his criminal case with Trinidad and had told Trinidad that "shit went bad because of what they did in Illinois, so he had to do what he got to do." Id. at 16:8-23. According to Trinidad, the petitioner had explained that he planned on killing Buckle and Vargas because he believed

the two were "were not going to keep their mouths shut." Id. at 17:5-12. Trinidad testified that the petitioner told him, "They brought [Buckle and Vargas] to a dark alley, if I'm not mistaken, and laid them on the ground. And then when he shot, he shot through the hoody. He thought he killed the victim, but it turned out to be that he played dead on him." Id. at 17:25-18:7. Trinidad further testified that the petitioner had expressed his concerns that Vargas had seen the petitioner's shoes during the shooting and that he was hoping Vargas would not testify against him. Id. at 18:24-19:19.

On March 29, 2012, the jury found the petitioner guilty of first-degree intentional homicide and first-degree attempted intentional homicide. Dkt. No. 26-2. On April 20, 2012, the court sentenced the petitioner to life in prison with a possibility of extended supervision after thirty years on the intentional homicide count and thirty years (twenty in prison and ten on extended supervision) on the attempted intentional homicide count, to be served concurrently. Id. at 2-4. The court entered an amended judgment of conviction on December 1, 2014, restricting the petitioner from contacting certain individuals. Id.

B.    Appeal and Postconviction Motions

The petitioner appealed the conviction, arguing that the circuit court had abused its discretion by allowing the State to introduce evidence of the Waukegan homicide and the events following the murder. Dkt. No. 26-3. The Wisconsin Court of Appeals affirmed the conviction, concluding that the circuit court had not erroneously exercised its discretion by admitting the evidence

7

because the evidence served a permissible purpose, had a substantial probative value for that purpose and posed little danger of causing the jurors to draw improper inferences. Dkt. No. 26-6 at 8. The Wisconsin Supreme Court denied the petition for review on November 13, 2014. Dkt. No. 17 at 30.

While the petitioner appealed his conviction, his co-defendant, Nieves, brought his own postconviction motion and appeal, arguing that his trial counsel was ineffective, that he was entitled to a new trial because the circuit court had erred in denying his motion to sever his trial from the petitioner's and that the circuit court erroneously admitted hearsay evidence at trial. Dkt. No. 26-8 at 22. The court of appeals reversed Nieves's conviction and remanded for a new trial, concluding that the circuit court had erred by denying his motion to sever. Id. at 25-39. The court also found that the circuit court had erred by overruling Nieves's objection to Vargas's testimony concerning what Boogie Man told him about Nieves and the petitioner's alleged plan to kill Vargas, determining that the testimony should have been ruled inadmissible. Id. at 39-43.

The State petitioned the Wisconsin Supreme Court to review the court of appeals' decision. The Wisconsin Supreme Court granted the petition for review and reversed the court of appeals. Dkt. No. 26-8 at 45-88. The court held that the circuit court did not err in denying Nieves's motion to sever trials and that the admission of Boogie Man's hearsay statement was harmless in light of Vargas's testimony. Id. at 46-47. The court explained that "the overwhelming evidence the State presented at trial of Nieves' guilt leads us to conclude that

he would have been found guilty of crimes for which he was convicted even if the circuit court had excluded Trinidad's testimony." Id. at 69. The court concluded that Vargas "explained both the events leading up to the homicide as well as the particulars of the crime. [He] testified that Nieves brought Buckle and him into an alley, where they fatally shot Buckle and where they shot and wounded him. As a result the evidence against Nieves was such that he would have been convicted without the testimony of Trinidad." Id. The court reinstated Nieves's judgment of conviction and remanded the case to the court of appeals to consider his remaining ineffective assistance of counsel claim. Id. at 47.

In 2018, the petitioner, represented by Attorney Ellen Henak, filed in circuit court a postconviction motion alleging ineffective assistance of trial and postconviction/appellate counsel. Dkt. No. 26-8. The petitioner argued that his trial counsel was ineffective for failing to object to Vargas's testimony that Boogie Man told Vargas that the petitioner was planning to shoot him Id. at 8-9. Referencing the court of appeals' decision reversing Nieves's conviction, the petitioner argued that his counsel acted unreasonably by failing to object to the inadmissible hearsay. Id. at 10. The petitioner contended that even though the Wisconsin Supreme Court had found the admission of the testimony harmless as to Nieves, the testimony had prejudiced the petitioner by unfairly bolstering Vargas's "weak identification" of the assailant. Id. at 10-11. The petitioner also alleged that his trial counsel was ineffective by failing to call two witnesses for the defense—Sugar Sullivan and Jeffrey Harper—who would have testified

9

about their interactions with Trinidad. Id. at 11-12. The petitioner contended that his trial counsel knew Sullivan had information suggesting that Trinidad had offered to recant his testimony in exchange for the petitioner paying him $5,000. Id. at 12. According to the petitioner, his trial counsel also knew that Harper had seen Trinidad reading the petitioner's legal papers to learn details about the case. Id. The petitioner argued that his postconviction counsel acted unreasonably by failing to identify and raise the ineffective assistance of trial counsel claims in the petitioner's postconviction motion. Id. at 15.

Attorney Henak attached to the motion an affidavit averring that she had spoken with Sugar Sullivan by telephone on January 25, 2015 and February 1, 2016, Dkt. No. 26-8 at 89. Based on her conversations with Sullivan, Attorney Henak averred that if permitted to testify at a hearing, Sullivan would testify that on or around September 19, 2011, at Trinidad's request, Sullivan delivered a note to the petitioner and told the petitioner that if he put $5,000 on Trinidad's "books," Trinidad would recant his statement to the police in which he said that the petitioner had confessed to the crime. Id. In the same affidavit, Attorney Henak averred that she had spoken with the petitioner's trial counsel, who would testify at a hearing that he could think of no strategic reason why he did not object to Vargas's testimony about Boogie Man's statements, and that "he may have failed to object in error" because Nieves's attorney made an objection and "he just missed joining her objection." Id. at 91.

The motion also included an affidavit from an investigator, Rikki Glen, who had interviewed Jeffrey Harper. Id. at 97-98. According to Glen, if permitted to testify at an evidentiary hearing, Harper would testify that Trinidad told Harper to tell the petitioner that Trinidad would not testify against the petitioner if the petitioner paid Trinidad $5,000. Id. at 98. Harper also would testify that Trinidad had asked Harper to "back him up" when Trinidad testified against the petitioner and promised that Trinidad's lawyer would get both of them out of jail if Harper did so. Id. Harper told Glen that Trinidad showed him court papers that belonged to the petitioner but that Harper never had the opportunity to read the papers because he was transferred to another pod. Id.

On July 16, 2018, the circuit court denied the postconviction motion. Dkt. No. 26-10. On the hearsay claim, the court reasoned that because the trial court had overruled Nieves's trial counsel's objection to the Boogie Man testimony, there was not a reasonable probability that it would have sustained the petitioner's counsel's same objection. Id. at 3. The court explained that even if the statement should not have been allowed into evidence, the error was harmless. Id. The court explained that it agreed with the Wisconsin Supreme Court's rationale in the Nieves appeal that the Boogie Man statement "when viewed in context, contributed little to [Vargas's] testimony" and that "[a]ny error that resulted from the admission of this statement was alleviated when [Vargas] explained how Nieves and [the petitioner] fatally shot Buckle and attempted to fatally shoot him." Id. The court also concluded that the petitioner

11

was not prejudiced by his trial counsel's failure to call Sullivan and Harper as witnesses. Id. at 5. The court explained that because Vargas's testimony was more than sufficient to convict the petitioner, there was not a reasonable probability that Sullivan's and Harper's testimony would have changed the outcome. Id. at 5.

On August 20, 2019, the court of appeals affirmed the circuit court's decision. Dkt. No. 26-14. The court found that the petitioner's trial counsel was not ineffective for failing to call Sullivan or Harper as witnesses. Id. at ¶¶12-19. First, the court explained that Sullivan's and Harper's proffered testimony would not definitively establish that Trinidad lied about the petitioner's admission of guilt, but would suggest only that Trinidad was willing to change his testimony if the petitioner paid him. Id. at ¶17. Next, the court rejected the petitioner's assertion that Harper's testimony would prove that Trinidad learned about the shooting from police reports and other legal documents. Id. at ¶18. Contrary to the petitioner's argument, the court of appeals concluded that Harper did not tell Glen that he saw Trinidad in the petitioner's cell and did not specify when he saw Trinidad in possession of the petitioner's papers. Id. Finally, the court explained that it agreed with the Wisconsin Supreme Court's assessment that Vargas's testimony "was so strong that even if Trinidad had not testified, or if his credibility had been further impeached, there is not 'a reasonable probability that … the result of the proceeding would have been different.'" Id. at ¶19. The court of appeals further concluded that given the strength of Vargas's testimony, the petitioner was not prejudiced by

his trial counsel's failure to object to the hearsay testimony concerning Boogie Man. <u>Id.</u> at ¶22.

The Wisconsin Supreme Court denied the petition for review on November 19, 2019. Dkt. No. 26-16.

C.    Federal *Habeas* Petitions

On February 1, 2016, the petitioner, represented by counsel, filed this federal *habeas* petition. Dkt. No. 1. Along with the petition, he filed a motion to stay. Dkt. No. 2. The motion explained that after the Wisconsin Supreme Court had denied his petition for review on November 13, 2014—and because he had not petitioned the United States Supreme Court for *certiorari*—the judgment of conviction had become final and the one-year limitation period under 28 U.S.C. §2244(d)(1)(a) had begun running ninety days later, on February 12, 2015. <u>Id.</u> at 2 n.1. The petitioner explained that he had filed the federal petition and the motion for a stay before exhausting his state-court remedies to avoid being barred by the statute of limitations. <u>Id.</u> at 2. The court granted the motion. Dkt. No. 4. On September 26, 2020, the court granted the petitioner's motion to lift the stay and for leave to file an amended petition, and the court reopened the case. Dkt. No. 15. On October 19, 2020, the court received the amended petition. Dkt. No. 17.

The amended federal petition asserts four grounds for relief. Ground One alleges that the petitioner's trial counsel unreasonably failed to object "on hearsay, confrontation clause, relevance, and undue prejudice grounds" when Vargas testified that Boogie Man told him that the petitioner, and Nieves,

planned to kill him. Dkt. No. 17 at 17. Ground Two asserts that the petitioner's trial counsel unreasonably failed to call as a witness a fellow incarcerated person, Sugar Sullivan, who would have testified that Trinidad had him deliver a message to the petitioner that Trinidad would recant his statements against the petitioner in exchange for $5,000. Id. at 20. Ground Three asserts that the petitioner's trial counsel unreasonably failed to call as a witness a fellow incarcerated person, Jeffrey Harper, who would have testified that Trinidad was trying to get Harper to lie about the petitioner's statements to support Trinidad's version of events. Id. Finally, Ground Four alleges that the petitioner's appellate counsel unreasonably failed to investigate and raise, on post-conviction motions or direct appeal, the ineffective assistance claims raised in the instant petition. Id. at 21.

D.    Brief in Opposition and Rebuttal Brief

The respondent filed a brief in opposition to the petition arguing that the Wisconsin courts' rejection of the petitioner's ineffective assistance of counsel claims was not an unreasonable application of, or contrary to, clearly established federal law. Dkt. No. 39 at 12.

## II.    Legal Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996, a federal court may grant *habeas* relief only if the state court decision was "either (1) 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'based on an unreasonable determination of the facts in light of the evidence

14

presented in the State court proceeding.'" Miller v. Smith, 765 F.3d 754, 759-60 (7th Cir. 2014) (quoting 28 U.S.C. §2254(d)(1), (2)). A federal *habeas* court reviews the decision of the last state court to rule on the merits of the petitioner's claim. Charlton v. Davis, 439 F.3d 369, 374 (7th Cir. 2006).

"'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" Renico v. Lett, 559 U.S. 766, 773 (2010) (quoting Williams v. Taylor, 529 U.S. 362, 410 (2000)). Indeed, "[t]he 'unreasonable application' clause requires the state court decision to be *more* than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 71 (2003) (emphasis added). In other words, §2254(d)(1) allows a court to grant *habeas* relief only where it determines that the state court applied federal law in an "objectively unreasonable" way. Renico, 559 U.S. at 773. "A state court's determination that a claim lacks merit precludes federal *habeas* relief so long as 'fair minded jurists could disagree' on the correctness of the state court's decision." Harrington, 562 U.S. at 102 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "The standard under §2254(d) is 'difficult to meet' and 'highly deferential.'" Saxon v. Lashbrook, 873 F.3d 982, 987 (7th Cir. 2017) (quoting Cullen v. Pinholster, 563 U.S. 170, 181 (2011)).

### III.  Analysis

All four of the petitioner's grounds for federal *habeas* relief concern ineffective assistance of counsel. "Under *Strickland v. Washington*'s familiar, two-pronged test for ineffective assistance of counsel, [the petitioner] must demonstrate that (1) his counsel's performance was deficient; and (2) that deficiency resulted in prejudice." United States v. Berg, 714 F.3d 490, 496-97 (7th Cir. 2013) (citing Strickland, 466 U.S. at 687). "The performance prong of *Strickland* requires a [petitioner] to show 'that counsel's representation fell below an objective standard of reasonableness.'" Lafler v. Cooper, 566 U.S. 156, 163 (2012) (quoting Hill v. Lockhart, 474 U.S. 52, 57 (1985)). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." Harrington, 562 U.S. at 105 (quoting Strickland, 466 U.S. at 690). "To establish *Strickland* prejudice a defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Lafler, 566 U.S. at 163 (quoting Strickland, 466 U.S. at 694).

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254 is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential", and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

Harrington, 562 U.S. at 105 (internal citations and quotations omitted).

A.     Ground One (Failure to Object to Hearsay Testimony)

Ground One alleges that the petitioner's trial counsel was ineffective for failing to object to Vargas's hearsay testimony concerning what Boogie Man told him about the petitioner's intent to kill Vargas. Dkt. No. 17 at 17. The Wisconsin Court of Appeals rejected this claim, reasoning that although Vargas's testimony concerning Boogie Man constituted hearsay, the petitioner had not shown that he was prejudiced by his counsel's failure to object. Dkt. No. 26-14 at ¶¶20-23. The court explained that because the trial court already had rejected *Nieves's* hearsay objection to the Boogie Man testimony, it was likely that the court also would have objected to the petitioner's counsel's objection. Id. at ¶¶21-22. The court also explained that based on the strength of Vargas's testimony, it was not persuaded that "'there was a reasonable probability that but for' the trial counsel's failure to object to the testimony, 'the result of the proceeding would have been different.'" Id. at ¶23.

The court cannot conclude that the court of appeals' decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. Miller, 765 F.3d at 759-60. The court of appeals cited Strickland, the seminal case that provides the framework for analyzing an ineffective assistance of counsel claim. The court determined that even if the petitioner's counsel was deficient for failing to object to the hearsay testimony, the petitioner could not establish

that he was prejudiced because of the strength of the rest of Vargas's testimony.

In addition to testifying that Boogie Man told him the petitioner wanted to kill him for talking about the Waukegan shooting, Vargas's testimony established that he and the petitioner were involved in the Waukegan shooting, that the petitioner and Nieves started to become paranoid after they discovered that an individual had died in the shooting and that he saw the petitioner's black shoes right before gunshots were fired, killing Buckle and injuring Vargas. Vargas also testified that there was no one else in the alley the night of the shooting other than himself, Buckle, the petitioner and Nieves. Through his testimony, Vargas explained the motive for the shootings and gave eyewitness testimony that the petitioner was standing near him right before the shooting—evidence the petitioner did not rebut at trial. Given the strength of Vargas's testimony, the court cannot find that the court of appeals was objectively unreasonable in concluding that the outcome of the trial would have been the same regardless of whether the jury had heard the statements concerning Boogie Man.

The petitioner is not entitled to relief under Ground One.

B.    Grounds Two and Three (Failure to Call Sullivan and Harper as Witnesses)

Grounds Two and Three allege ineffective assistance of trial counsel for failing to investigate and call Sugar Sullivan and Jeffrey Harper as witnesses. The petitioner alleges that Sullivan's and Harper's testimony would have called into question Trinidad's testimony that the petitioner had made incriminating

18

statements to him. Correctly applying Strickland, the court of appeals held that the petitioner had failed to establish that he was prejudiced by his counsel's failure to call Sullivan and Harper as witnesses. Id. at ¶16. The court of appeals reached this conclusion by finding that (1) Sullivan and Harper would not have established that Trinidad lied when he testified that the petitioner admitted participating in the shooting; (2) Harper's testimony would not prove that Trinidad learned about the shooting from police reports and other legal documents as opposed to hearing the details directly from the petitioner; and (3) Vargas's testimony was strong enough to lead to a conviction regardless of whether Trinidad had testified or had his testimony impeached. Id. at ¶¶ 17-19.

The court cannot conclude that the court of appeals' decision rejecting Grounds Two and Three involved an unreasonable application of Strickland. The court of appeals bypassed the deficient performance prong and held that the petitioner had not demonstrated that he was prejudiced by his trial counsel's failure to call Sullivan and Harper as witnesses. The court agrees with the court of appeals' assessment that Sullivan's and Harper's testimony would not have established that Trinidad lied when he testified that the petitioner confided him about details concerning the shooting. Had Sullivan provided the testimony Attorney Henak described, at most he would have provided evidence that Trinidad was willing to recant what he told the police in exchange for $5,000. While this would certainly call into question the Trinidad's credibility, it would not definitively establish that his original

19

testimony was untrue. The same is true for Harper's proffered testimony. Harper allegedly would have confirmed that Trinidad was willing to change his testimony for $5,000. Harper also would have testified that Trinidad had some of the petitioner's court papers. This testimony may well have caused the jury to question Trinidad's credibility, but it wouldn't have established that Trinidad was lying. And, as the court of appeals reasoned, because Harper never had the opportunity to read the court papers he claimed to have seen in Trinidad's possession, his testimony would not have established that Trinidad learned the details of the shooting from those papers rather than from the petitioner.

Because Sullivan's and Harper's testimony would have, at most, put Trinidad's credibility into question, the court of appeals was not unreasonable in concluding that there was no reasonable probability that the jury would have acquitted the petitioner had it heard their testimony. As the court explained in addressing Ground One, Vargas's testimony established a motive for the petitioner to kill Buckle and Vargas. Vargas's testimony also established that he was in an alley with the petitioner at the time of the shooting and that he saw the petitioner's shoes by his head just before shots were fired that killed Buckle and wounded Vargas. It was not unreasonable for the court of appeals to conclude that testimony impeaching Trinidad would not be sufficient to cause the jury to disregard or reject Vargas's testimony regarding the events leading up to the shooting and the shooting itself.

The petitioner is not entitled to relief under Grounds Two or Three.

C.    Ground Four (Ineffective Assistance of Appellate Counsel)

Ground Four alleges that the petitioner's postconviction/appellate counsel unreasonably failed to raise the claims addressed in Grounds One, Two and Three, despite the petitioner's request that counsel do so. Dkt. No. 17 at 21. It appears that the petitioner raised this ground for relief in anticipation that the respondent would argue that he procedurally defaulted on Grounds One, Two and Three. As the respondent points out in his brief in opposition, Ground Four is unnecessary because neither the circuit court nor the court of appeals relied on the Escalona-Naranjo procedural bar[1] to deny the petitioner's ineffective assistance of trial claim; they addressed the claims on their merits. Dkt. No. 39 at 12 n.4. Ground Four does not provide an avenue for relief.

## IV.    Certificate of Appealability

Under Rule 11(a) of the Rules Governing Section 2254 Cases, the court must consider whether to issue a certificate of appealability. A court may issue a certificate of appealability only if the applicant makes a substantial showing of the denial of a constitutional right. See 28 U.S.C. §2253(c)(2). The standard for making a "substantial showing" is whether "reasonable jurists would debate (or for that matter, agree that) the petition should have been resolve in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (internal quotations omitted). The court declines to issue a certificate of

---

[1] Under Escalona-Naranjo, a petitioner must raise all available claims for relief in his first post-conviction motion or on direct appeal. State v. Escalona-Naranjo, 185 Wis. 2d 168, 181 (Wis. 1994).

appealability because it concludes that reasonable jurists could not debate the court's decision that the petitioner is not entitled to relief under 28 U.S.C. §2254.

## V.    Conclusion

The court **DISMISSES** the petitioner's amended §2254 petition for a writ of *habeas corpus.* Dkt. No. 17.

The court **DECLINES** to issue a certificate of appealability.

The court **ORDERS** that the case is **DISMISSED**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 14th day of December, 2023.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**